IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

KENARD MAURICE COLLINS,       :
                              :
        Petitioner            :
                              :    CIVIL NO. 4:09-CV-2454
                              :
        v.                    :    Hon. John E. Jones III
                              :
                              :
RICARDO MARTINEZ,             :
                              :
        Respondent            :

## MEMORANDUM

October 25, 2010

**THE BACKGROUND OF THIS MEMORANDUM IS AS FOLLOWS:**

Petitioner Kenard Maurice Collins ("Petitioner" or "Collins"), an inmate
presently confined at the United States Penitentiary at Allenwood ("USP Allenwood")
in White Deer, Pennsylvania, initiated this action by filing a *pro se* Petition for Writ of
Habeas Corpus ("Petition") under the provisions of 28 U.S.C.
§ 2241.  (Doc. 1.)  Collins alleges that he was denied due process during two (2)
prison disciplinary proceedings after which he was found guilty and sanctioned with
the loss of good conduct time.  He also alleges that the consideration he received from
the Federal Bureau of Prisons ("BOP") for placement in a Residential Reentry Center
("RRC") was inconsistent with the provisions of the Second Chance Act.

Service of the Petition (Doc. 1) and accompanying Exhibits (Doc. 2), which were filed on December 14, 2009, was directed by Order dated December 21, 2009 (Doc. 5). Following a request for an extension of time to file a response (Doc. 6), on February 1, 2010, a Response (Doc. 10), supporting exhibits[1] (Docs. 10-2 through 10-5), and supporting authority (Docs. 10-6 through 10-9) were filed.

On February 18, 2010, Petitioner filed a Motion in which he requested a thirty (30) day extension of time to file a Reply and an Order to compel Respondent to turn over discovery pursuant to his requests. (Doc. 12.) Although he described the discovery he sought as the written statement of a former USP Allenwood employee, medical records, and a surveillance tape, Petitioner did not provide sufficient information to determine whether he demonstrated good cause to be granted discovery in this habeas corpus action. Therefore, by Order dated February 22, 2010, that portion of his request was denied. (*See* Doc. 13.) However, we granted Petitioner's request for an extension of time until March 24, 2010 to file his reply brief. (*See id.*) Petitioner filed his reply brief on March 22, 2010. (Doc. 14.) Accordingly, the instant

---

[1]In support of the Response, Respondent submitted the Declaration of Todd W. Cerney, a Disciplinary Hearing Officer at USP Allenwood, who presided over the disciplinary hearings at issue in this case (Doc. 10-2 at 3-22), as well as supporting attachments (Doc. 10-2 at 24-25; Doc. 10-3). In addition, Respondent submitted the Declaration of Kelly McMahan, a Correctional Treatment Specialist at USP Allenwood, who participated in Petitioner's consideration for placement in an RRC (Doc. 10-4 at 1-9), as well as supporting attachments (Doc. 10-4 at 11-30; Doc. 5).

Petition is fully briefed and ripe for disposition. We shall consider Collins' due process claim and RRC placement claim in turn below, and for the reasons set forth herein, the Petition will be denied as to both claims.

**DUE PROCESS CLAIM**

**I.    BACKGROUND**

**A.    Incident Report 1834072**

On February 16, 2009, Collins received an incident report at USP Allenwood charging him with a code 307 violation for refusing to obey an order of any staff member; a code 222 violation for possession of intoxicants; and a code 405 violation for possession of tatooing paraphernalia. (Doc. 10-2 at 5, Cerney Decl., ¶ 10; Doc. 10-2 at 24-25, Incident Report 1834072.[2]) On February 16, 2009 at 4:25 p.m., Lieutenant James Nickerson presented Collins with advance written notice of the charges against him and informed Collins of his right to remain silent. (Doc. 10-2 at 5-6 ¶¶ 11-12; Doc. 10-2 at 25, Blocks 23-24.) At that time, Collins displayed a fair attitude. (Doc. 10-2 at 6 ¶ 12; Doc. 10-2 at 25, Block 24.) Collins stated, "No comment," and did not request any witnesses. (Doc. 10-2 at 6 ¶ 12; Doc. 10-2 at 25, Block 25.) Based on Collins' refusal to provide mitigating or extenuating evidence or circumstances, Lieutenant Nickerson referred the incident report to the Unit Discipline

---

[2]Citations to page numbers refer to the page numbers generated by the CM/ECF system.

Committee ("UDC").  (Doc. 10-2 at 6 ¶ 12; Doc. 10-2 at 25, Blocks 23-27.)

On February 18, 2009 at 7:50 a.m., the UDC conducted its hearing.  (Doc. 10-2 at 6 ¶ 13; Doc. 10-2 at 24, Blocks 17, 21.)  After he was advised of his rights, Collins stated, "I have nothing to say."  (Doc. 10-2 at 6 ¶ 13; Doc. 10-2 at 24, Blocks 17, 21.) Based on the reporting officer's report, the UDC recommended a sanction of thirty (30) days disciplinary segregation time, the loss of twenty-seven (27) days of good conduct time, and they referred the charges to the Disciplinary Hearing Officer ("DHO") for further disposition.  (Doc. 10-2 at 6 ¶ 14; Doc. 10-2 at 24, Blocks 18-20.)

At the time of the UDC hearing, Collins was provided with a copy of the "Inmate Rights at Discipline Hearing" Form, which advised him of the following rights: (a) to have a written copy of the charge(s) against him at least twenty-four (24) hours before the hearing; (b) to have representation by a full-time staff member at the hearing; (c) to call witnesses, present written statements of unavailable witnesses, and present documentary evidence on his behalf, provided institutional security would not be jeopardized; (d) to present a statement or to remain silent, but with the condition that his silence could be used to draw an adverse inference; (e) to be present throughout the discipline hearing, except during deliberation or when institutional security would be jeopardized; (f) to receive a written DHO decision; and (g) to

4

appeal the DHO decision through administrative remedy procedures within twenty (20) days of the DHO's decision. (Doc. 10-2 at 6-7 ¶ 15; Doc. 10-3 at 2-3, Inmate Rights at Discipline Hearing.) Although Collins refused to sign the form to acknowledge that he had been advised of his rights at the hearing, Correctional Counselor Jonathan Grill indicated that the form was given to Collins on February 18, 2009 at 7:50 a.m., as well as Collins' refusal to sign. (Doc. 10-2 at 7 ¶ 16; Doc. 10-3 at 2-3.)

Also at the time of the UDC hearing, Correctional Counselor Grill provided Collins with a copy of the "Notice of Discipline Hearing before the DHO" Form. (Doc. 10-2 at 8 ¶ 17; Doc. 10-3 at 5, Notice of Discipline Hearing before the DHO.) The form reflects that Collins requested that Physician Assistant ("PA") J. Russell serve as his staff representative, but that he declined to call any witnesses. (Doc. 10-2 at 8 ¶ 17; Doc. 10-3 at 5.) Because Collins also refused to acknowledge receipt of the Notice of Discipline Hearing before the DHO Form, Grill signed the Form as a witness. (Doc. 10-2 at 8 ¶ 17; Doc. 10-3 at 5.)

On February 27, 2009, PA Russell agreed to serve as Collins' staff representative. (Doc. 10-2 at 8 ¶ 18.) Russell then reviewed and signed the "Duties of Staff Representative" Form instructing her of the following duties: (a) to assist in presenting whatever information the inmate wants to present and in preparing defense;

(b) to speak to witnesses who might furnish evidence on behalf of the inmate, if the inmate indicates there are such witnesses whom the inmate wishes to have called; (c) to become familiar with all reports relative to the charge against the inmate (noting that confidential or security information must be protected and may not be shared with any other person, and that any request for confidential information should be directed to the DHO); (d) to present any evidence favorable to the inmate's defense; (e) to present information which may assist the DHO and which may contain a lesser sanction for the inmate; (f) to help an inmate understand the charges and the potential consequences; (g) to be familiar with procedures at the hearing, explain them to the inmate in advance, and if necessary, during the hearing, assist the inmate in understanding procedural points; (h) to not be present during deliberations by the DHO, except with regard to confidential information that must be discussed with the DHO outside the inmate's presence; and (i) if requested by the inmate, to assist in writing an administrative appeal. (*Id.*; Doc. 10-3 at 7, Duties of Staff Representative.)

On March 6, 2009, Collins appeared before DHO Cerney for his discipline hearing on Incident Report 1834072. (Doc. 10-2 at 9 ¶ 19; Doc. 10-3 at 9-11, DHO Report (Incident Report 1834072).) PA Russell stated that she did not note any discrepancies in the discipline process, that she met with Collins in advance of the hearing to discuss his case, and informed the DHO that Collins did *not* understand

"how the Alco-Sensor could have worked on his coat [to detect the presence of intoxicants]." (Doc. 10-3 at 9, Block II. E.) Collins was advised of his rights by DHO Cerney at the outset of the hearing. (Doc. 10-2 at 10 ¶ 22; Doc. 10-3 at 9, Block III. B.) Collins indicated that he understood his rights and that he was waiving his right to witness testimony. (Doc. 10-2 at 10 ¶ 22; Doc. 10-3 at 9, Block III. B.)

Collins was provided with an opportunity to make a statement, and stated as follows: "This thing is a false allegation. I was dumping some mash. He gave me an order to give him what I had and I ran. That's how we are told to do needles. We're supposed to label them so the Officers don't get stuck. I never had wine, this is false. I always admit what's mines [*sic*]." (Doc. 10-2 at 10-11 ¶ 23; Doc. 10-3 at 9, Block III. B.)

No procedural issues were cited, and no documentary evidence was provided by Collins. (Doc. 10-2 at 11 ¶ 24; Doc. 10-3 at 9, Block III. B.) All documents in reference to the case were disclosed to PA Russell. (Doc. 10-2 at 11 ¶ 25; Doc. 10-3 at 9-10, Block III. B.)

In addition to the Incident Report and Investigation, the DHO considered the following evidence: pictures of the tattoo needle found in Collins' cell; the envelope holding the tattoo needle found in Collins' locker; and Collins' coat, which was soaked with homemade intoxicants. (Doc. 10-2 at 11 ¶ 26; Doc. 10-3 at 10, Block III.

D.)  Further, in explaining the evidence relied on to support his findings, DHO Cerney

summarized Collins' participation in the incident, as adapted from Section 11 of the

Incident Report, as follows:

> Paraphrased, Officer Santiago writes: On February 16, 2009, at or about
> 1:00 p.m., I was standing by the metal detector in Unit 4-A during the
> feeding of the noon meal when inmate, COLLINS, #41356-037 entered.
> I asked inmate COLLINS for a pat search.  At this time, he stated he had
> wine in his coat.  I asked him to take it out and give it to me.  He stated
> that he could not.  I then gave him a direct order to give it to me, and he
> took off running toward his cell.  He blocked the cell door with his body
> so I could not get in and poured the trash bag with the liquid into the
> toilet.  The inmate's coat gave a reading of .429 on the alco-sensor III
> when tested because the bag broke as he was attempting to dispose of the
> evidence.  While packing inmate COLLINS' property, I found a tattoo
> needle inside an envelop[e] with his name and number addressed to him
> inside his locker with other personal property.  The envelope had tattoo
> needle written on the other side of it.

(Doc. 10-3 at 10, Block V.)  The DHO then noted that, when he questioned Collins at

the hearing, he denied the charges, and then elaborated by providing the statement that

was summarized earlier in the DHO Report.  (*Id.*)        Based on the evidence,

DHO Cerney concluded that Collins had committed the prohibited acts of possession

of intoxicants, refusing to obey an order of any staff member, and possession of

tattooing paraphernalia.  (Doc. 10-2 at 12 ¶ 29; Doc. 10-3 at 10, Blocks IV, V.)  DHO

Cerney imposed the following sanctions: thirty (30) days of disciplinary segregation

time; the disallowance of twenty-seven (27) days of good conduct time; and the loss

of visitation, telephone, and commissary privileges for three (3) months.  (Doc. 10-2

at 12 ¶ 29; Doc. 10-3 at 11, Block VI.)

At no time during the hearing did Collins or PA Russell raise issues concerning Russell's performance as a staff representative. (Doc. 10-2 at 11 ¶ 27.) In addition, although Collins alleges in the instant Petition that Russell failed to review "evidence tapes," Cerney has declared under penalty of perjury that, to the best of his knowledge, no such tapes exist and that neither Collins nor Russell requested that Cerney review any such tapes during the disciplinary process. (*Id*. at 11-12 ¶ 28.)

DHO Cerney advised Collins of his findings, the specific evidence relied upon, the action, and the reasons for the action. (*Id.* at 12 ¶ 30; Doc. 10-3 at 11, Block VIII.) DHO Cerney also advised Collins that, under the Administrative Remedy Procedure, he had the right to appeal the decision within twenty (20) calendar days, and he provided Collins with a copy of his report. (Doc. 10-2 at 12 ¶ 30; Doc. 10-3 at 11, Block VIII.)

In accordance with 28 C.F.R. § 541 *et seq.*, Inmate Discipline and Special Housing Units, Cerney found no due process or procedural violations in Collins' disciplinary hearing with regard to Incident Report 1834072. (Doc. 10-2 at 12 ¶ 31.) Specifically, Collins received written notice of the charged misconduct when he was given a copy of the incident report on February 16, 2009 within twenty-four (24) hours of the incident. (Doc. 10-2 at 13 ¶ 32.) The UDC hearing was conducted on

February 18, 2009, which was within three (3) working days after the incident report was written and more than twenty-four (24) hours after Collins was notified of the charges. (*Id.* ¶ 33.) In addition, Collins appeared before an impartial hearing body and was afforded the opportunity to present witnesses (which he waived) and documentary evidence. (*Id.* ¶¶ 34, 35.) Moreover, Collins was provided the opportunity for a staff member to represent him, and PA Russell, the representative he chose, performed in that capacity. (*Id.* ¶ 36.)

DHO Cerney found "some evidence or basis in fact" which supported his conclusion that Collins had committed the prohibited acts. (*Id.* ¶ 37.) Collins was provided with a copy of DHO Cerney's Report, which contained a written statement of the evidence relied upon and the rationale behind the decision that Collins had committed the prohibited acts. (*Id.* at 13-14 ¶ 38.) The record also reflects that DHO Cerney advised Collins of his right to appeal his decision and that he received a copy of the DHO Report. (*Id.* at 14 ¶ 39.) Although PA Russell has resigned from her position with the BOP and could not be located when a response to the instant Petition was being prepared, DHO Cerney has declared under penalty of perjury that it is clear from the record that PA Russell performed her duties as staff representative. (*Id.* ¶ 40.)

### B.    Incident Report 1834075

On February 16, 2009, Collins received a second incident report at USP

Allenwood charging him with a code 307 violation for refusing to obey an order of any staff member and a code 297[3] violation for refusing to provide a Breathalyzer or to take part in other testing for use of alcohol. (*Id.* ¶ 41; Doc. 10-3 at 13-14, Incident Report 1834075.) On February 16, 2009 at 4:30 p.m., Lieutenant James Nickerson presented Collins with advanced written notice of the charges against him and informed Collins of his right to remain silent. (Doc. 10-2 at 14-15 ¶ 42; Doc. 10-3 at 14, Blocks 23-24.) At that time, Collins verbally acknowledged that he understood his rights, and displayed a fair attitude. (Doc. 10-2 at 15 ¶ 43; Doc. 10-3 at 14, Block 24.) Collins stated, "I took the Breathalyzer test and got zeros and they never gave me a second test," and he did not request any witnesses. (Doc. 10-2 at 15 ¶ 43; Doc. 10-3 at 14, Blocks 24, 25.) Based on Collins' refusal to provide mitigating or extenuating evidence or circumstances, Lieutenant Nickerson referred the incident report to the UDC. (Doc. 10-2 at 15 ¶ 43; Doc. 10-3 at 14, Blocks 23-27.)

At the outset of the UDC hearing on February 18, 2009 at 7:45 a.m., Collins was advised of his rights and stated that he understood. (Doc. 10-3 at 13, Block 17.) Collins then stated, "This is bogus." (*Id.*) Based on the reporting officer's report, the UDC recommended a sanction of thirty (30) days disciplinary segregation time, the loss of twenty-seven (27) days of good conduct time, and they referred the charges to

---

[3]The actual Code setting forth this prohibited act is Code 223. (Doc. 10-2 at 14 n.2.)

the DHO for further disposition.  (*Id.*, Blocks 18-20.)

At the time of the UDC hearing, Collins was provided with a copy of the "Inmate Rights at Discipline Hearing" Form, and the "Notice of Discipline Hearing Before the DHO Forms."  (Doc. 10-2 at 15-16 ¶¶ 45, 46.)  Collins refused to sign to acknowledge that he had received either of these Forms, and his refusal was noted on both Forms by Correctional Counselor Grill.  (Doc. 10-2 at 16 ¶ 48; Doc. 10-3 at 16-17, Inmate Rights at Discipline Hearing; Doc. 10-3 at 19, Notice of Hearing before the DHO.)

Collins requested that PA Russell serve as his staff representative, and requested one witness: PA Inch.  (Doc. 10-2 at 16 ¶ 48; Doc. 10-3 at 19.)  On February 27, 2009, PA Russell agreed to serve as Collins' staff representative.  (Doc. 10-2 at 16 ¶ 49.)  Russell then reviewed and signed the "Duties of Staff Representative" Form, which sets forth her responsibilities.  (*Id.* at 16-17 ¶ 49; Doc. 10-3 at 21, Duties of Staff Representative.)

On March 6, 2009, Collins appeared before DHO Cerney for his discipline hearing on Incident Report 1834075.  (Doc. 10-2 at 17 ¶ 50; Doc. 10-3 at 23-25, DHO Report (Incident Report 1834075).)  PA Russell stated that she did not note any discrepancies in the discipline process and that she met with Collins in advance of the hearing to discuss his case.  (Doc. 10-3 at 23, Block II. E.)  In addition, Russell stated

that Collins had informed her that he voluntarily complied with the Breathalyzer test. (*Id.*)

Collins was advised of his rights by DHO Cerney at the outset of the hearing. (Doc. 10-2 at 18 ¶ 53; Doc. 10-3 at 23, Block III. B.)  Collins indicated that he understood his rights and then stated as follows: "They took me through the tunnel.  I blew twice, the machine clicked.  He said it read .000.  They took me down to medical and Ms. Inch took my blood and gave me an exam.  No, she wasn't there when I was breathalyzed."  (Doc. 10-2 at 18 ¶ 54; Doc. 10-3 at 9, Block III. B.)

No procedural issues were cited, and no documentary evidence was provided by Collins.  (Doc. 10-2 at 18 ¶ 55; Doc. 10-3 at 23, Block III. B.)  All documents in reference to the case were disclosed to PA Russell.  (Doc. 10-2 at 18 ¶ 56; Doc. 10-3 at 23, Block III. B.)  Although Collins requested the opportunity to call PA Inch as a witness, DHO Cerney did not call her as a witness because Collins admitted that she was not present when he was breathalyzed, and only saw him in the Health Services Unit after he had been taken there from his housing unit to have blood drawn.  (Doc. 10-2 at 18-19 ¶ 57; Doc. 10-3 at 24, Block III. C. 3.)  Therefore, the DHO stated: "The DHO did not find this relevant to the charged act.  COLLINS stated that Ms. Inch was not present when he had been breathalyzed.  With this, the DHO did not believe she had information pertinent to the act."  (Doc. 10-3 at 24, Block III. C. D.)  Cerney has

declared that, as a DHO, pursuant to 28 C.F.R. § 541.17(c), he is required to call only those witnesses who have information directly relevant to the charge(s) and who are reasonably available.  (Doc. 10-2 at 19 ¶ 58.)

In explaining the evidence relied on to support his findings, DHO Cerney summarized Collins' participation in the incident, as adapted from Section 11 of the Incident Report, as follows:

> Paraphrased, Officer Klapp writes: On February 16, 2009, at or about 1300 hours, I escorted inmate COLLINS, Kenard, #41356-037, from Unit IV-A to the Lieutenant's Office.  Once there, I asked inmate COLLINS to submit to a breathalyzer test.  Inmate COLLINS did not initially respond. I then gave inmate COLLINS an order to submit to a breathalyzer test.  I placed the breathalyzer device to his lips and he began to suck into the tube instead of flow air through the tube.  This action caused a malfunction of the breathalyzer device and an accurate reading was unable to be obtained [*sic*].  Inmate COLLINS was then escorted to the Special Housing Unit.

(Doc. 10-3 at 24, Block V.)  The DHO then noted that, when he questioned Collins at the hearing, he denied the charges and made the statement summarized at the outset of the DHO Report.  (*Id.*)  After reviewing Section 11 of the Incident Report and Collins' statements, DHO Cerney concluded that the greater weight of the evidence supported a finding that Collins had committed the prohibited act of Code 223, refusing to provide a Breathalyzer or to take part in a test for alcohol use.  (Doc. 10-2 at 19-20 ¶ 62; Doc. 10-3 at 24, Blocks IV, V.)  He expunged the refusing an order charge "due to duplicitous elements."  (Doc. 10-3 at 24, Block V.)

DHO Cerney imposed the following sanctions: thirty (30) days of disciplinary segregation time and the disallowance of twenty-seven (27) days of good conduct time. (Doc. 10-2 at 19-20 ¶ 62; Doc. 10-3 at 25, Block VI.)

At no time during the hearing did Collins or his staff representative, PA Russell, raise issues concerning Russell's performance as a staff representative. (Doc. 10-2 at 19 ¶ 60.) In addition, although Collins alleges in the instant Petition that Russell failed to review "evidence tapes," Cerney has declared under penalty of perjury that, to the best of his knowledge, no such tapes exist and that neither Collins nor Russell requested that Cerney review any such tapes during the disciplinary process. (*Id*. ¶ 61.)

DHO Cerney advised Collins of his findings, the specific evidence relied upon, the action, and the reasons for the action. (*Id.* at 20 ¶ 63; Doc. 10-3 at 25, Block VIII.) DHO Cerney also advised Collins that, under the Administrative Remedy Procedure, he had the right to appeal the decision within twenty (20) calendar days, and he provided Collins with a copy of his report. (Doc. 10-2 at 20 ¶ 63; Doc. 10-3 at 25, Block VIII.)

In accordance with 28 C.F.R. § 541 *et seq.*, Inmate Discipline and Special Housing Units, Cerney found no due process or procedural violations in Collins' disciplinary hearing with regard to Incident Report 1834072. (Doc. 10-2 at 20 ¶ 64.)

Specifically, Collins received written notice of the charged misconduct when he was given a copy of the incident report on February 16, 2009 within twenty-four (24) hours of the incident. (*Id.* ¶ 65.) The UDC hearing was conducted on February 18, 2009, which was within three (3) working days after the incident report was written and more than twenty-four (24) hours after Collins was notified of the charges. (*Id.* at 21 ¶ 66.) In addition, Collins appeared before an impartial hearing body and was afforded the opportunity to present witnesses and documentary evidence. (*Id.* ¶¶ 67, 68.) Moreover, Collins was provided the opportunity for a staff member to represent him, and PA Russell, the representative he chose, performed in that capacity. (*Id.* ¶ 69.)

DHO Cerney found "some evidence or basis in fact" which supported his conclusion that Collins had committed the prohibited acts. (*Id.* ¶ 70.) Collins was provided with a copy of DHO Cerney's Report, which contained a written statement of the evidence relied upon and the rationale behind his decision. (*Id.* ¶ 71.) The record also reflects that DHO Cerney advised Collins of his right to appeal his decision and that Collins received a copy of the DHO Report. (*Id.* ¶ 72.) Although PA Russell has resigned from her position with the BOP and could not be located when a response to the instant Petition was being prepared, DHO Cerney has declared under penalty of perjury that it is clear from the record that PA Russell performed her

duties as staff representative. (*Id.* at 22 ¶ 73.)

## II.     DISCUSSION

The Fourteenth Amendment of the United States Constitution provides in pertinent part as follows: "No State shall . . . deprive any person of life, liberty, or property, without due process of law . . . ." The Supreme Court has mandated a two-part analysis of a procedural due process claim: first "whether the asserted individual interests are encompassed within the . . . protection of 'life, liberty or property [ , ]'" and second, "if protected interests are implicated, we then must decide what procedures constitute 'due process of law.'" *Ingraham v. Wright*, 430 U.S. 651, 672 (1977). If there is no protected liberty or property interest, it is unnecessary to analyze what procedures were followed when an alleged deprivation of an interest occurred.

Federal inmates possess a liberty interest in good conduct time. *See Wolff v. McDonnell*, 418 U.S. 539, 555-57 (1974); *Young v. Kann*, 926 F.2d 1396, 1399 (3d Cir. 1991). In the case at hand, Collins was sanctioned with the loss of a total of fifty-four (54) days of good conduct time credit following the two disciplinary proceedings at issue here, and therefore, he has identified a liberty interest that is at stake in this matter.

In *Wolff*, where the plaintiffs were deprived of good time credits as a severe sanction for serious misconduct, the Supreme Court held that such inmates had

various procedural due process protections in a prison disciplinary proceeding, including the right to call witnesses and to appear before an impartial decision-maker. 418 U.S. at 563-73.

In particular, the Court recognized that "prison disciplinary proceedings are not part of a criminal prosecution, and the full panoply of rights due a defendant in such proceedings does not apply." *Id.* at 556. Nonetheless, the Court held that a prisoner facing serious institutional sanctions is entitled to some procedural protection before penalties can be imposed. *Id.* at 563-71. The Court set forth the following five requirements of due process in a prison disciplinary proceeding: **(1)** the right to appear before an impartial decision-making body; **(2)** twenty-four hour advance written notice of the charges; **(3)** an opportunity to call witnesses and present documentary evidence, provided the presentation of such does not threaten institutional safety or correctional goals; **(4)** assistance from an inmate representative, if the charged inmate is illiterate or if complex issues are involved; and **(5)** a written decision by the fact finders as to the evidence relied upon and the rationale behind their disciplinary action. *Id.*

An additional procedural requirement was set forth in *Superintendent, Massachusetts Correctional Inst., Walpole v. Hill*, 472 U.S. 445, 453-56 (1985). In that case, the Court held that there must be some evidence which supports the

conclusion of the disciplinary tribunal.

Upon review of the record in this case, it is apparent that Collins was afforded each of the due process protections set forth in *Wolff* in both of the disciplinary proceedings at issue in this case. Specifically, Collins received the opportunity to appear before an impartial hearing body; he was provided with written notice of the charges against him more than twenty-four (24) hours before his disciplinary hearings; he was afforded the opportunity to call witnesses and to present documentary evidence; he was given the assistance of the staff representative that he chose to represent him; and he was provided with a thorough written explanation of the DHO's decision in each of the cases, as well as the rationale behind each of the decisions.

Further, upon review of the DHO Reports explaining the reasons for the guilty findings in both cases, it is evident that the DHO's findings were supported by "some evidence." As to the finding of guilt with respect to Incident Report 1834072, DHO Cerney relied both on inculpatory evidence, including pictures of the tattoo needle found in Collins' cell; the envelope holding the tattoo needle found in Collins' locker; and Collins' coat, which was soaked with homemade intoxicants. (*See* Doc. 10-2 at 11 ¶ 26; Doc. 10-3 at 10, Block III. D.) The DHO also relied on Collins' own testimony that when he was asked to give the officer his coat, he ran, which the DHO

found to be a "direct contradiction" of Collins' other testimony that he "always admits what's mines [*sic*]."  (*See* Doc. 10-3 at 10-11, Block V.)

With regard to the finding that Collins refused a Breathalyzer test in connection with Incident Report 1834075, DHO Cerney concluded that the greater weight of the evidence supported a finding that Collins had committed the prohibited act of refusing to provide a Breathalyzer.  In making his finding, the DHO specifically cited the portion of the incident report  describing Collins' involvement in the incident, including that Collins did not initially respond to an order to submit to the test, and then when the device was placed to his lips, he sucked air from the tube rather than blowing into it causing the machine to malfunction.  (*See* Doc. 10-2 at 19-20 ¶ 62; Doc. 10-3 at 24, Blocks IV, V.)

The DHO also specifically cited Collins' statement at the DHO hearing that "They took me through the tunnel.  I blew twice, the machine clicked.  He said it read .000.  They took me down to medical and Ms. Inch took my blood and gave me an exam.  No, she wasn't there when I was breathalyzed."  (*See* Doc. 10-2 at 18 ¶ 54; Doc. 10-3 at 24, Block V.)  The DHO found that Collins' testimony was not credible, particularly where Collins "possessed the ability to avoid possible punishment by not telling truth" and where the officer who ordered Collins to take the Breathalyzer "was not known to be able to gain anything by providing the false allegation against

Collins." (*See* Doc. 10-3 at 24, Block V.)  Based on the foregoing, it is evident that the DHO's findings of guilt were based on "some evidence."

In his reply brief, Collins argues that the DHO's decisions were not based on the greater weight of the evidence because he did not base his decisions on reliable information.  (*See* Doc. 14, Reply Brief, at 8.)  In particular, with regard to the hearing on the charge of refusing to provide a Breathalyzer, Collins alleges that the DHO violated due process in disallowing the testimony of PA Inch based on a determination that she did not have information relevant to the proceeding and that the DHO should have reviewed the result of the blood test that was performed by PA Inch that he claims would have exonerated him.  (*See id.*)

A prisoner has the limited right to call witnesses who have relevant information and would not present a threat to penological interests.   *Wolff,* 418 U.S. at 566-67; 28 C .F.R. § 541.17(c).  *See also Moles v. Holt,* 221 Fed. Appx. 92, 95 (3d Cir. 2007) ("A prisoner facing charges that may result in a loss of good-time credits has a due process right to call witnesses at a disciplinary hearing when permitting him to do so will not be unduly hazardous to institutional safety or correctional goals") (quotations omitted).  Inmates do not have an absolute, constitutionally-protected right to confront and cross-examine witnesses at their prison disciplinary hearings.  *Wolff,* 418 U.S. at 567-69; *see also Baxter v. Palmigiano,* 425 U.S. 308, 321-22 (1976);

*Young,* 926 F.2d at 1404.

As referenced by DHO Cerney in his Declaration (*see* Doc. 10-2 at 19 ¶ 58), the applicable regulation provides as follows:

> [t]he DHO shall call those witnesses who have information directly relevant to the charge(s) and who are reasonably available . . . . The DHO need not call repetitive witnesses. The reporting officer and other adverse witnesses need not be called if their knowledge of the incident is adequately summarized in the Incident Report and other investigative materials supplied to the DHO . . . . The DHO shall document reasons for declining to call requested witnesses in the DHO report . . . .

28 C.F.R. § 541.17(c); *see also Moles,* 221 Fed. Appx. at 95 ("it is not a denial of due process to deny an inmate an opportunity to present witnesses whose testimony would be irrelevant, repetitive, or unnecessary") (quotations omitted).

The record shows that there was no due process violation with regard to the DHO's determination not to call PA Inch as a witness in the disciplinary proceedings relating to the charge of refusing to provide a Breathalyzer. In arguing in his reply brief that the DHO violated due process in disallowing Inch's testimony because it purportedly would establish that the blood test she performed showed that Collins was not intoxicated, it is apparent that Collins does not understand the ultimate issue in his disciplinary proceeding. (*See* Doc. 14 at 8-9.) The issue was not limited to whether Collins was intoxicated. Rather, based on the charges, the issue was whether he refused to submit to a Breathalyzer test in order to determine if he was intoxicated. If he was charged solely

with being intoxicated, then perhaps the testimony of PA Inch might be relevant as to whether Collins appeared intoxicated and/or as to whether the blood test she administered revealed that he was intoxicated. However, Collins was charged with committing the prohibited act of refusing to provide a Breathalyzer. Therefore, if PA Inch was not present at the time Collins was ordered to submit to the test, then, as observed by the DHO (*see* Doc. 10-3 at 24, Block III. C. 3.), Inch did not have any information that sheds light on whether Collins had refused the test.

For the foregoing reasons, Collins has not shown that the DHO's findings were not supported by the greater weight of the evidence or that he was not afforded the procedural protections of *Wolff*, and the portion of the instant Petition raising a due process claim will be denied. We now turn to an analysis of Collins' claim regarding the consideration he received from the BOP for RRC placement.

**RRC PLACEMENT CLAIM**

**I.      BACKGROUND**

Collins was sentenced in the District of Maryland on September 7, 2005 to an aggregate term of imprisonment of ninety-three (93) months for carjacking in violation

of 18 U.S.C. § 2119(1), aiding and abetting in violation of 18 U.S.C. § 2, and conspiracy to use a firearm during and in relation to a crime of violence in violation of 18 U.S.C. § 924(n). (*See* Doc. 10-2 at 4-5, Cerney Decl., ¶ 7.) Collins also received an aggregated three (3) year term of supervision and was ordered to pay a felony assessment of $200.00. (*See id.*) As of the date of filing of a Response in this action, Collins had a projected release date of February 17, 2011 via good conduct time release. (*See id.* at 5 ¶ 8.)

Subsequent to Collins' sentencing, on April 9, 2008, the Second Chance Act of 2007, Pub.L. No. 110-199, Title II, § 251, 122 Stat. 657, 692 (the "Second Chance Act"), codified at 18 U.S.C. §§ 3621, 3624, was signed into law. The Second Chance Act increases an inmate's eligibility for pre-release placement in an RRC from six (6) to twelve (12) months and requires the Bureau of Prisons ("BOP") to make an ***individual*** determination that ensures that the placement is "of sufficient duration to provide the greatest likelihood of successful reintegration into the community." 18 U.S.C. § 3624(c)(6)(C) (Apr. 9, 2008). In making this determination, the following five criteria from 18 U.S.C. § 3621(b) are to be considered: (1) the resources of the facility contemplated; (2) the nature and circumstances of the offense; (3) the history and characteristics of the prisoner; (4) any statement by the sentencing court concerning the purpose for which the sentence was imposed or a recommendation of a particular type of correctional facility; and (5) any pertinent policy statement issued by the Sentencing

Commission pursuant to section 994(a)(2) of title 28.  18 U.S.C. § 3621(b).

"Assessing inmates under the above criteria necessarily includes continuing to consider the more specific, and familiar, correctional management criteria found in [Program Statement] 7310.04 , including, but not limited to, the inmate's needs for services, public safety, and the necessity of the Bureau to manage its inmate population responsibly." (*See* Doc. 10-4 at 4 ¶ 11.)

Following the passage of the Second Chance Act, the BOP issued two guidance memoranda dated April 14, 2008 (Doc. 10-5 at 11-20) and November 14, 2008, both of which required approval from the Regional Director for RRC placements of longer than six (6) months.  Interim regulations passed on October 21, 2008 state that "[i]nmates may be designated to community confinement as a condition of pre-release custody and programming during the final months of the inmate's term of imprisonment, not to exceed twelve months."  28 C.F.R. § 570.21(a) (*see* Doc. 10-5 at 22-25, Copy of 10/21/08 Interim Regs.).  Moreover "[i]nmates will be considered for pre-release community confinement in a manner consistent with 18 U.S.C. § 3621(b), determined on an individual basis, and of sufficient duration to provide the greatest likelihood of successful reintegration into the community, within the time-frames set forth in this part." 28 C.F.R. § 570.22 (*see* Doc. 10-5 at 23-24).

Recommendations for RRC placements ordinarily are reviewed with the inmate

and the Unit Team seventeen (17) to nineteen (19) months before each inmate's probable release date.  (*See* McMahan Decl., Doc. 10-4 at 3 ¶ 9.)  Referrals are then forwarded to the Community Corrections Manager ("CCM") at least sixty (60) days prior to the maximum recommended range or date.  (*See id.* at 5 ¶ 14 (citing BOP Program Statement ("P.S.") 7310.04, *Community Corrections Center Utilization and Transfer Procedures*) (Doc. 10-4 at 11-30, Doc. 10-5 at 1-11).)  On March 17, 2009, during Collins' Program Review, the Unit Team discussed his pre-release plans with him.  (*See id.* at 5 ¶ 15.)  This review took place approximately twenty-three (23) months prior to Collins' projected release date.  (*See id.*)  During this review, Collins informed Correctional Treatment Specialist ("CTS") McMahan that he intended to reside with his mother in Virginia after his release, but he did not have a job.  (*See id.* at 6 ¶ 16.)

On May 8, 2009, CTS McMahan submitted a request for relocation of supervision to the District of Virginia.  (*See id.* ¶ 17.)  On May 22, 2009, the District of Virginia indicated that Collins' release plan was suitable and they agreed to accept supervision of Collins.  (*See id.* ¶ 18.)  Based on the acceptance, on May 27, 2009, McMahan considered Collins for RRC placement.  (*See id.* ¶ 19.)  In her Declaration submitted under penalty of perjury in this action, McMahan states that, in making Collins' RRC placement decision, she "considered the nature and circumstances of [his] offense (carjacking, aiding and abetting, and conspiracy to use a firearm) and [his] history and characteristics

(including his institutional adjustment, disciplinary history, and interaction with other inmates and staff)." (*See id*.)  McMahan also noted that, although the sentencing court recommended that Collins be placed in FCI Petersburg in Petersburg, Virginia, so that he could be closer to his family and participate in vocational programs, on January 18, 2008, he was transferred from FCI Petersburg to USP Allenwood as a greater security transfer after he received two incident reports for use of drugs or drug items.  (*See id.* at 6-7 ¶ 20.)  Finally, McMahan declares as follows with respect to additional factors she considered:

> I also noted that the Petitioner had a secure residence upon release, but that he would need time to secure employment; that he did not have any financial obligations; that he did not have any medical restrictions; that he completed numerous education programs and earned his G.E.D. while in the custody of the Bureau of Prisons; and that he had a Public Safety Factor of 'greatest severity' based on the nature of his instant offense.

(*See id.* at 7 ¶ 21.)  Based on her review, McMahan recommended that Collins receive one hundred twenty (120) days of RRC placement.  (*See id.* ¶ 22; Doc. 10-5 at 27, RRC Consideration Recommendation.)  In her recommendation, McMahan stated that "120 days is sufficient to seek employment and prepare for a return to society." (*See* Doc. 10-5 at 27.)

On June 10, 2009, the Acting Warden submitted an "Institutional Referral for

CCC[4] Placement" to the CCM in which he recommended that Collins receive RRC placement for a period of ninety (90) to one hundred and twenty (120) days. (*See* Doc. 10-4 at 8 ¶ 23; Doc. 10-5 at 29, "Institutional Referral for CCC Placement.")

After considering the recommendation of the Acting Warden, the resources of the facility contemplated, and the necessity of the BOP to manage its inmate population responsibly, on July 1, 2009, the CCM approved Collins for sixty (60) days of RRC placement at the Rehabilitation Services II, Newport News, Virginia. (*See* Doc. 10-4 at 8 ¶ 24.) As of the time of filing of a Response in this action, CTS McMahan verified that, assuming there were no further changes to Collins' release date, he was scheduled for release to the RRC on or about December 17, 2010. (*See id.* ¶ 25.)

## II.   DISCUSSION

Title 28 U.S.C. § 2241 "confers habeas jurisdiction to hear the petition of a federal prisoner who is challenging not the validity but the execution of his sentence." *Coady v. Vaughn*, 251 F.3d 480, 485 (3d Cir. 2001) (quoting 28 U.S.C. §§ 2241(a) and (c)(3)). In *Woodall v. Federal Bureau of Prisons*, the United States Court of Appeals for the Third Circuit concluded that § 2241 is the appropriate means for challenging a decision to exclude an inmate from release to an RRC. 432 F.3d 235, 242 (3d Cir. 2005).

---

[4]"CCC" stands for Community Correctional Center, which was the term previously used by the BOP to refer to an RRC.

As set forth above, the BOP exercises its authority pursuant to the Second Chance Act to determine individual inmate placements to an RRC by applying the five (5) factors set forth in 18 U.S.C. § 3621(b). In his reply brief, Collins claims that the BOP is eroding Congress's intent in passing the Second Chance Act, and in particular, the intent to increase the maximum duration of RRC placements from six (6) months to twelve (12) months and to consider inmates for RRC placement on an individual basis. (*See* Doc. 14, Reply Brief, at 2.) With regard to the CCM's approval of a sixty (60) day RRC placement in his case, Collins argues that "surely 60 days does not fall within the increase mandates of the Act." (*See id*. at 3.) In particular, Collins claims that a sixty (60) day placement would "run afoul to a successful reintegration into today['s] broken society," in which a "high unemployment rate" exists and that "the BOP rationale is conduc[]ive to and will lead to increased recidivism." (*See id.*) Collins also argues that "there is nothing within or beyond" the five (5) factors set forth in 18 U.S.C. § 3621 that would restrict his placement in an RRC to sixty (60) days. (*See id.* at 4.) Within his reply brief, Collins cites *Krueger v. Martinez*, 665 F. Supp. 2d 477 (M.D. Pa. 2009) and *Strong v. Schultz*, 599 F. Supp. 2d 556 (D.N.J. 2009) in support of his position.

In *Krueger*, the Honorable Sylvia H. Rambo of this Court articulated the following conclusion:

> It is clear to this court that by increasing the maximum placement period from six months to twelve months, and requiring the BOP to ensure that

29

placements are long enough to provide 'the greatest likelihood of successful reintegration,' Congress intended that each inmate be considered for the full twelve month period of RRC placement with the only limitation being the application of the § 3621(b) factors. *See* 18 U.S.C. § 3624(c)(1), (6). The BOP's memoranda add additional hurdles that find no support in the text of the Second Chance Act. While it may be true that any given prisoner need not be placed in a RRC for longer than six months, it is not universally true that every prisoner will benefit from the same limitations. By depriving the initial decision maker of the ability to recommend placement unfettered by a presumptive six month cap, the BOP significantly reduces the possibility of a truly individualized review that objectively determines the duration required 'to provide the greatest likelihood of successful reintegration into the community.' 18 U.S.C. § 3624(c)(6)(C). Accordingly, because the duration of Krueger's RRC placement was determined pursuant to these impermissible limitations, the BOP abused its discretion in deciding that Krueger's placement would be for five to six months.

*Id.* at 483. As relief, Judge Rambo "grant[ed] a writ of habeas corpus directing the BOP to reconsider the length of Krueger's RRC placement taking into consideration the requirements of the Second Chance Act and the factors outlined in 18 U.S.C. § 3621(b) and disregarding the limitations imposed by either the April 14, 2008 or November 14, 2008 memoranda." *Id.* at 484.

In an earlier decision, *Strong*, the United States District Court for the District of New Jersey determined that the policies contained in the April 14, 2008 BOP Guidance Memorandum (*see* Doc. 10-5 at 11-20) were inconsistent with regulatory guidelines included in the Second Chance Act's amendments to 18 U.S.C. § 3624(c). 599 F. Supp. 2d at 563. The Court held that the "[m]emorandum impermissibly constrains staff's discretion to designate inmates to a CCC for a duration that will provide the greatest

likelihood of successful reintegration into the community, contrary to § 3624(c)(6)(C)."

*Id.*

Having considered these cases, we now observe that their limited holding has been recognized in recent decisions. In cases where, as is the situation here, an RRC placement decision has been made after the issuance of the BOP's October 21, 2008 regulations (73 Fed. Reg. 62440), courts consistently have concluded that the Second Chance Act affords the BOP discretionary authority to transfer an inmate to an RRC for up to twelve months prior to the inmate's release date after consideration of the factors set forth in 18 U.S.C. § 3621(b). *See Stokes v. Norwood*, No. 09-5645, 2010 WL 1930581, at *6 (D.N.J. May 12, 2010) (collecting cases); *see also McDonald v. Obama*, Civil No. 1:10-CV-0379, 2010 WL 1526443, at *6 (M.D. Pa. Mar. 15, 2010) (Report & Recommendation) (Carlson, M.J.) (collecting cases), *approved and adopted*, 2010 WL 1526447 (Caldwell, J.); *Cullum v. Bledsoe*, Civil No. 1:09-CV-2385, 2010 WL 2521035 (M.D. Pa. Jun. 15, 2010) (Conner, J.); *Wires v. Bledsoe*, Civil No. 3:09-CV-2247, 2010 WL 427769, at *4 (M.D. Pa. Feb. 3, 2010) (Munley, J.) (finding that the record clearly established that the petitioner's unit team gave petitioner individualized consideration for RRC placement consistent with the five factors of section 3621(b)).

With regard to the application of the § 3621(b) factors in the instant case, in considering Collins for RRC placement, as set forth above, CTS McMahan "considered

the nature and circumstances of Petitioner's offense (carjacking, aiding and abetting, and conspiracy to use a firearm)", including that he had a Public Safety Factor of "greatest severity", and Petitioner's "history and characteristics (including his institutional adjustment, disciplinary history, and interaction with other inmates and staff)." (*See* Doc. 10-4 at 6, 7 ¶¶ 19, 21.) Contrary to Collins' assertion in his reply brief that the length of the RRC placement he ultimately received does not adequately take into account his ability to reintegrate into society, it specifically was noted that, despite the fact that he has a secure residence upon release and does not have any financial obligations, Collins would require time to find a job. (*See id.* at 7 ¶ 21.) In evaluating Collins' likelihood of successfully obtaining employment, McMahan observed that, while he was in the custody of the BOP, Collins had completed numerous education programs and earned his G.E.D., and also that he has no medical restrictions. (*See id.*) It is apparent from the record that Collins received individualized consideration for RRC placement consistent with the § 3621(b) factors. Accordingly, the portion of his Petition raising a claim with respect to the consideration Collins received from the BOP for RRC placement will be denied.

**CONCLUSION**

For the foregoing reasons, the Petition for Writ of Habeas Corpus will be denied, and the Clerk of Court will be directed to close this case. An appropriate Order will enter.